IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 19-03022-01-CR-S-RK |
| ROY L. NOREY, | ) ) ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE

Before the Court is Defendant Roy L. Norey's Motion to Suppress Evidence (doc. 23), which has been referred to the undersigned for preliminary review pursuant to 28 U.S.C. § 636(b). Defendant Norey moves to suppress all evidence obtained as a result of the search warrant issued on January 3, 2019, and executed by the Springfield Police Department ("SPD") on the same day. The undersigned held an evidentiary hearing on the Motion on August 22, 2019. (*See* Docs. 31 and 35.) Defendant Norey was present with his attorney, John F. Appelquist, and the United States Government was represented by Special Assistant United States Attorney Jessica R. Keller. (*Id.*) The Court heard testimony from Brad Nicholson, a detective with the SPD, and Cindy Shipley, manager of customer services at City Utilities in Springfield, Missouri. (*Id.*) For the reasons set forth below, it is **RECOMMENDED** that Defendant's Motion (doc. 23) be **DENIED**.

I. **Findings of Fact**[1]

In early 2018, a reliable confidential informant reported that Roy L. Norey, the Defendant in this matter, was bringing heroin and marijuana from Chicago and distributing the controlled substances in Springfield from a property located at 1042 West College St., Springfield, Greene

---

[1] The facts set forth herein are taken from the testimony adduced and the exhibits admitted at the hearing on the instant Motion. The parties' exhibit indices appear at doc. 32. The hearing transcript appears as doc. 35.

1

County Missouri ("the College address"). Nicholson testified that during surveillance on the College address, he observed Norey as well as various other people coming and going from the College location on numerous occasions.[2] On November 30, 2018, and December 20, 2018, Nicholson conducted traffic stops on individuals leaving the College address. During the first stop in November, he immediately smelled marijuana on the driver, which prompted a vehicle search and resulted in the discovery and seizure of two bags of marijuana. During the search of a second vehicle in December, Nicholson discovered a small amount of marijuana, a digital scale, and a large amount of counterfeit currency.

On December 23, 2018, a mass shooting at the College address resulted in several injuries and one fatality. Following the shooting, the SPD Violent Crimes Unit executed a search warrant at the College address, locating four firearms and what they believed to be heroin and marijuana. Norey was not taken into custody as a result of the incident at the College address.

Nicholson testified the SPD had previously received a call on October 17, 2018, by a female with the last name Norey who reported that residents at the Old Monterey Apartments at 230 E. Montclair St. ("the Montclair address") "are selling drugs and guns in Chicago."[3] (Doc. 32, Def. Ex. G.) The caller did not know the apartment number, but stated "the residents are Frank Daniels, Roy Norey, Crystal Norey [and a] four-year-old child." (*Id*.) She also reported that "Roy Norey carries a bag with money and his drug phone and personal cell phone, and sometimes a firearm." (*Id*.) Contrary to the call for service report, Nicholson testified the caller had reported Norey was selling guns and drugs from the apartment at the Montclair St. address. On cross examination, Nicholson agreed that per the report, the caller stated Norey was selling drugs and guns in Chicago, not from the apartment on Montclair, but claimed the report "needed to be

---

[2] As discussed later, Nicholson's observations of Norey at the College address are not included in the affidavit.
[3] The record is not clear at what point during the investigation Nicholson became aware of the October 17 call.

corrected." Nicholson also testified he continued to investigate Norey after the shooting, surveilling both the College and Montclair addresses, because he believed Norey was still selling heroin and marijuana and was a dangerous person. He further testified he observed Norey coming and going from the Montclair apartment "numerous times."[4]

On January 2, 2019, Nicholson observed Norey leave "the residence and drive away."[5] (*See* Doc. 32, Gov. Ex. 2.) Knowing that Norey did not have a valid driver's license, Nicholson conducted a traffic stop.[6] As he approached the vehicle, Nicholson immediately smelled burnt marijuana coming from inside the vehicle and asked Norey about the smell. Norey admitted he had recently smoked marijuana and had a small amount of marijuana on his person. Nicholson discovered a baggie of marijuana on the inside of Norey's jacket pocket. He also searched the vehicle but did not find any physical evidence of drug use inside the vehicle. Nicholson testified based on his surveillance of both properties, his conversation with Norey and the discovery of marijuana on Norey's person, he determined Norey had recently smoked marijuana in his apartment at the Montclair address where he had just observed Norey leaving. He released Norey without citing him for any violations.

On January 3, 2018, Nicholson prepared an affidavit to obtain a warrant for the search of the Montclair address for heroin and marijuana, as well as records, documents, money or drug paraphernalia commonly used for the distribution of controlled substances or drugs. (*See* Doc. 32, Gov. Ex. 2.) He presented the warrant and application to Greene County Circuit Judge Jerry

---

[4] Given the narrative in Nicholson's own affidavit, however, it is unclear how long he had conducted surveillance on the Montclair address. While Nicholson's testimony suggests he had surveilled Norey at the Montclair address on more than one occasion, the Court notes Nicholson's affidavit attests he "began" conducting surveillance of the Montclair address on January 2, 2019, and only notes this one instance of surveillance.
[5] It is unclear from the record whether Nicholson observed Defendant leaving Apartment 3B or if he saw him leaving the general vicinity of the apartment complex.
[6] The affidavit does not specify, and the Government did not elicit from the witness, how far away from the apartment the stop occurred. According to dash cam video of the location of the stop, the traffic stop occurred approximately 1 mile from the Old Monterey Apartments and lasted approximately twenty-four minutes. (*See* Doc. 37-1, Def. Ex. H.)

Harmison, who signed the warrant the same day. Nicholson testified that at the time he applied for the warrant, he had been a detective with the SPD since 2015 and had written "or been involved in more than 150 drug-related search warrants."[7] (*Id.*)

In support of the warrant to search the Montclair address, Nicholson's affidavit set forth his relevant law enforcement and drug investigation experience, stated his belief that the individuals "present at the execution of this warrant are *likely* to be persons involved in the illegal drug culture," and described a number of items and evidence he averred would be found on persons "involved in the illegal drug culture," in their control or hidden in "safes, outbuildings, and in their vehicles parked at their own residences."[8] The affidavit detailed the following information from the investigation: that a reliable confidential informant reported Norey was distributing "heroin" from the College address; that Nicholson conducted surveillance on the College address on "numerous occasions" and observed "numerous vehicles coming and going from the [College] address"; that Nicholson conducted two traffic stops of vehicles leaving the College address and seized marijuana and evidence of drug paraphernalia; that a shooting incident at the College address authorized a search warrant that resulted in the seizure of "four firearms, *suspected* heroin, marijuana and pills"; that Nicholson "began conducting surveillance" of the Montclair address on "01/02/2019" and observed Norey leave the residence; and that he conducted a traffic stop where he smelled burnt marijuana and seized a small baggie of marijuana from Norey's jacket after Norey admitted to recently smoking marijuana. The affidavit also stated a "city utilities check shows Roy and Natasha Norey as the account holders for 230 East Montclair, Apartment 3B," and further

---

[7] Although not elicited by the Government during Nicholson's testimony, pursuant to the search warrant affidavit, Nicholson has been a law enforcement officer with the SPD for over eight years, currently assigned to the Special Investigations Unit, and was previously an officer for three years with the City of Oskaloosa, Iowa. He has received specialized training in the recognition of controlled substances, and the detection/interdiction of such substances.

[8] Nicholson's affidavit does not specifically aver that a person in possession of marijuana in his vehicle is likely to have contraband in his residence. It also does not aver whether, in general, it is common for drug dealers to store drug evidence in their residence or describe what facts support such an inference in this case.

4

noted that "a criminal history check [of Defendant] shows entries for Unlawful Use of a Weapon, Possession of Cannabis, Delivery of a Controlled Substance and Domestic Battery.

Though Nicholson testified he believed Norey resided at the Montclair address with his wife Natasha based on observing Defendant coming and going from the residence and the October 17 phone call reporting Norey lived there, he failed to include any of these crucial details in the affidavit. Neither does the affidavit describe Nicholson's observations of Norey at the College address, detail Norey's course of drug dealing activities, include information about who owned or held the utility records at the College property or otherwise draw any associations between the College address and the Montclair address. Nicholson testified he did not include all of the information from his investigation in the affidavit, explaining he believed the information he had included was enough to support probable cause given his discovery of marijuana in Norey's possession and the investigation of the College address.

A review of City Utilities records identified Defendant Norey's wife, Natasha, as the account holder for both the College and Montclair addresses. (*See* Doc. 32, Gov. Ex. 1.) While Norey was noted as having "shared responsibility"[9] for the utility account at the College address, he was not identified as an account holder or associated in any way to the utility account records for the Montclair address. Nicholson testified that he used a special law enforcement database to access and research utility records for both the College and the Montclair addresses. He credibly testified he was not aware the he had made a mistake in the affidavit and explained he confused the account information from both addresses when he stated in the affidavit that Roy was an "account holder" for the Montclair address.

Pursuant to the warrant, officers executed a search of the Montclair address and seized

---

[9] City Utilities customer service manager, Cindy Shipley, testified that an account holder and a party who is identified as a person with "shared responsibility" are both considered to be account holders.

evidence. On February 19, 2019, a grand jury charged Norey with a violation of Title 18 U.S.C. § 922(g)(1) and 924(a)(2) for being a felon in possession of a firearm and ammunition. (Doc. 12.)

II. **Conclusions of Law**

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. amend. IV; *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005). Generally, evidence found because of an unlawful search or seizure, and the fruits therefrom, cannot be used against a defendant and must be suppressed. *United States v. Riesselman*, 646 F.3d 1072, 1078-79 (8th Cir. 2011). Defendant moves to suppress evidence seized following the execution of the search warrant, arguing it lacked probable cause. The Government responds sufficient probable cause supported the affidavit and even if the warrant is found invalid for lack of probable cause, the *Leon* good-faith exception precludes suppression of the evidence. Defendant further argues Nicholson's affidavit contains false statements, made deliberately or with reckless disregard to the truth, absent which the affidavit would not provide probable cause. In particular, Defendant takes issue with the fact that the affidavit says Norey was a utility account holder for the Montclair property when the actual utility records only show Natasha Norey as the account holder. The Government contends this was an unintentional misstatement that does not entitle Defendant to a Franks hearing nor amounts to a Franks violation. The Court takes up the arguments below.

A. **The Warrant Lacks Probable Cause**

Defendant argues the warrant lacks probable cause because it fails to establish a sufficient nexus between the Montclair address and the suspected evidence of drug dealing activity. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Probable cause exists if there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A judge issuing a warrant determines probable cause looking only at "that information which is found

6

within the four corners of the affidavit," and reviews the affidavit with a "common sense approach and not in a hypertechnical fashion." *United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014). To find probable cause, "there must be evidence of a nexus between the contraband and the place to be searched." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)(citation omitted). A reviewing court pays deference to the issuing judge's probable cause determination and simply ensures that the judge had a "substantial basis" for concluding that probable cause existed. *O'Dell*, 766 F.3d at 873.

The undersigned agrees the affidavit provides little to no information about any criminal activity, much less any drug activity, at the Montclair address. Despite the absence of information about drug related activity at the Montclair address, the Government essentially asks this Court to find Defendant's status as a drug dealer, as reported by a confidential source, and drug activity at an unrelated property, coupled with his criminal history and the discovery of marijuana in his possession during a traffic stop shortly after leaving his residence is enough to support probable cause to search that residence for evidence of heroin, marijuana *and* drug trafficking.[10] Although a sufficient nexus does not require direct or specific evidence tying a suspect's criminal activities to his home, the Eighth Circuit has not adopted a *per se* rule that probable cause to arrest a drug trafficker establishes an inference that evidence of drug trafficking will be found in his home. *U.S. v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007). Instead, probable cause to search a drug dealer's

---

[10] The Government seems to initially suggest, without support, that Norey's possession of marijuana in his vehicle and admission he had recently smoked, was, by itself, probable cause that evidence of the possession of marijuana would be found in his residence. The undersigned finds no support to conclude a driver's mere possession of contraband in their vehicle and admission of consuming such after recently leaving their home, standing alone, is sufficient to establish probable cause to search that driver's residence for evidence of possession or drug trafficking. The Government subsequently argues the "search of the apartment supported that drug distribution activity was occurring at that location." However, what was found during the search is irrelevant to the Court's analysis.

home exists "where officers have stated that in their experience such an inference is appropriate and in which a supporting affidavit also describes a defendant's continuous course of drug trafficking activity." *Id.*[11]

Here, not only is there no evidence that any evidence of heroin would be found at the Montclair address, the undersigned is also not convinced the affidavit sufficiently establishes either Norey's status as a drug dealer or a continuous course of drug dealing activity sufficient to support the inference that evidence of the distribution of marijuana would be found at the Montclair address. *See e.g. United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016)(facts suggesting defendant was involved in drug conspiracy were too inconclusive to assume he was a known drug dealer such that it supported probable cause to search defendant's residence).

The Government argues the discovery of marijuana on Norey, a person reported to be involved in drug activity at an unrelated property, with a criminal history of drug crimes, who admitted to recently smoking marijuana shortly after leaving his home supports an obvious inference that contraband would be found at the Montclair address. The Government's reliance on *United States v. Wajda*, 810 F.2d 754, (8th Cir. 1987), is unpersuasive. In that case, it was not merely the defendant's statement "that he was going to get cocaine" that supported probable cause to search his brother's residence for contraband. There, police had a "legion" of evidence of drug trafficking by the Wajda brothers gained from undercover buys, surveillance and phone tracking. *Id.* at 757. Undercover agents set up a buy for six ounces of cocaine, surveilled one of the brothers, Lawrence, after he agreed to go "get the cocaine," noted he stopped at a mall with a small child, then briefly at his brother Donald's house where officers observed Donald reach into a van and

---

[11] The bare inference that drug traffickers may keep contraband or evidence in their home is not always sufficient to provide probable cause to search their residence. However, several other circuits have allowed such an inference in specific circumstances. *See e.g. Ross*, 487 F.3d at 1123-23 (citing other circuits that find nexus to search home of individuals closely tied to narcotics trafficking).

enter his house before Lawrence departed. Lawrence had not stopped anywhere else prior to delivering two of the promised six ounces of cocaine, and, upon arrest, Donald was found with the currency the government had paid in the undercover buy, all of which the court found supported probable cause to search Donald's residence for the remaining cocaine. *Id*.

Here, dissimilar to *Wajda*, Nicholson's affidavit does not detail any facts from Nicholson's surveillance of Norey, does not include any observations of Norey's suspicious movements or even criminal activities, or otherwise demonstrate Norey was engaged in any continuous course of drug trafficking activity. Though the affidavit states a reliable source reports Norey deals heroin from the unrelated College address[12] and describes subsequent surveillance and a search that corroborate ongoing drug activity at the College address, the affidavit never details Norey's connection to the College address and further fails to disclose if Norey was ever even observed at the College address. Neither does the affidavit describe any drug activity, or criminal activity for that matter, at the Montclair address. Instead, the affidavit states Nicholson observed Norey leave the Montclair residence on one occasion, stopped him shortly thereafter and discovered marijuana in his possession in his vehicle a mile from his home. Contrary to the Government's assertion, the undersigned is not convinced these facts support the conclusion that "Norey began keeping evidence of his drug distribution activities at his [Montclair address]" because "police had cut off his distribution activities at the [College address]."

Even where the Eighth Circuit has found a sufficient nexus exists to search the home of someone known to be involved in drug trafficking despite a lack of specific evidence tying criminal activities to a drug dealer's home, those cases rely on a demonstrated course of drug activity by

---

[12] While the partially corroborated information from a reliable informant can support the probable cause determination, (*see e.g. United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009)), the information from the reliable informant here does little to demonstrate a course of drug dealing activity sufficiently connected to the Montclair address.

9

the defendant before such an inference is allowed. *See e.g. United States v. Patterson*, 666 F. App'x 569, 572 (8th Cir. 2016) (surveillance of known drug dealer's repeated visits to her home in between suspicious meetings established nexus to search her home for contraband); *United States v. Garcia-Hernandez*, 682 F.3d 767, 771-72 (8th Cir. 2012) (sufficient nexus demonstrated where defendant's vehicles were observed at the homes of other known drug dealers and vehicles of known drug dealers observed at defendant's residence); *United States v. Keele*, 589 F.3d 940, 943-44 (2009) (extensive drug paraphernalia found at car accident scene and agent's stated reasons on why evidence was indicative of drug manufacturing created sufficient nexus to search defendant's home for contraband); *Tellez*, 217 F.3d at 549-550 (sufficient nexus to search residence where defendant arranged multiple drug sales with informant and had not been anywhere other than his home when he was stopped and found with drugs in his vehicle); *United States v. Hartje*, 251 F.3d 771, 774 (8th Cir. 2001) (sufficient nexus where defendant was observed purchasing items to manufacture methamphetamine); *United States v. Luloff*, 15 F.3d 763, 768 (1994) (nexus shown where affidavit established defendant's continuous course of drug activity for several years and agent averred that drug traffickers often keep such evidence in their homes).

In contrast to the cases above, the undersigned finds the affidavit in the present case fails to provide the kind of facts or averments by Nicholson that sufficiently demonstrate Defendant's status as a drug dealer or the kind of course of drug related activity that supports an inference that evidence of contraband would be found at an address where, according to the affidavit, no criminal activity had ever been observed and where Defendant was only observed once. Although judges can certainly "draw reasonable inferences" in determining probable cause, *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007), given the limited information in the affidavit, the lack of any information corroborating Defendant's involvement in drug related activity at the College address, the limited observation of Defendant at the Montclair property and the lack of

10

information suggesting drug related activity at the Montclair property, the undersigned finds the issuing judge did not have a substantial basis to find probable cause existed within the affidavit.

### B. The *Leon* Good Faith Exception Applies

Even though the Court is not persuaded the affidavit establishes a sufficient nexus between the contraband and the place to be searched, the *Leon* good faith exception precludes suppression of the evidence. The exclusionary rule does not apply in cases where "the police acted 'in objectively reasonable reliance'" of a search warrant issued by a judge or magistrate. *Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). Evidence seized as a result of such good-faith reliance will thus be admitted unless:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702-03 (8th Cir. 2017) (internal quotes omitted); *see also Leon*, 468 U.S. at 923. Notwithstanding its exceptions, the good-faith inquiry "is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal in light of all the circumstances." *Herring*, 555 U.S. at 145 (internal quotes omitted). Circumstances include "what the affiant knew but did not include in the application for the warrant." *United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010).

Here, given Nicholson's training and experience and investigation of Norey's suspected drug-related activity at the College address, the Court cannot conclude that Nicholson would have known that the search of the Montclair address was illegal in light of all the circumstances. Neither does the Court find the supporting affidavit was "so lacking in indicia of probable cause" that reliance on the search warrant was "entirely unreasonable." Nicholson's affidavit detailed the

11

Case 6:19-cr-03022-MDH   Document 39   Filed 11/05/19   Page 11 of 14

investigation about suspected drug related activity at the College address, the evidence discovered following traffic stops of vehicles leaving the College address, the shooting incident and Norey's criminal history. Although there is conflicting evidence in the record regarding whether Nicholson personally observed Norey at the College address and how long Nicholson surveilled Norey coming and going from the Montclair property, the affidavit describes Nicholson's observation of Norey leaving the Montclair property on one occasion, and his traffic stop of and discovery of marijuana on Norey. Nicholson further testified he had observed Norey coming and going from the College address, knew Norey was an account holder for the utilities at the College address and believed he resided at the Montclair address due to his additional surveillance, none of which was detailed in the search warrant affidavit. Prior to obtaining the search warrant, he also knew about the information from the caller on October 17 further reporting Norey's drug related activity and residence at the Montclair address. Although Nicholson failed to include all of this in his affidavit, his investigation suggests Defendant was known for selling marijuana in the area. Based on these facts, Nicholson's belief that probable cause existed here would not be "entirely unreasonable."

With prior experience in "developing probable cause," Nicholson had no reason to question the issuing judge's determination. Neither does the Court find that Nicholson knowingly and intentionally misled the issuing judge, that the issuing judge wholly abandoned his judicial role in issuing the warrant, or that the warrant was so facially deficient that no police officer could reasonably presume the warrant to be valid. As such, Nicholson objectively and reasonably relied on a search warrant issued by a neutral magistrate, and the evidence should not be suppressed.

### C. The *Franks* Challenge is Denied

"To obtain a *Franks* hearing a defendant must make a 'substantial preliminary showing' of a deliberate or reckless false statement or omission which was necessary to the finding of probable cause, a requirement which is 'not easily met.'" *United States v. Snyder*, 511 F.3d 813,

816 (8th Cir. 2008); *see Franks v. Delaware*, 438 U.S. 154, 170-72 (1978). Thus, to "prevail on a Franks claim the defendant must first demonstrate that the law enforcement official deliberately or recklessly included a false statement in, or omitted a true statement from, his warrant affidavit." *Id*. A defendant must then establish the affidavit would lack sufficient probable cause if the allegedly false information is ignored. *Id*.; *United States v. Coleman*, 349 F.3d 1077, 1083 (8th Cir. 2003). A *Franks* challenge "must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. "A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *United States v. Crissler*, 539 F.3d 831, 834 (8th Cir. 2008)(citing *Franks*, 438 U.S. at 171).

Here, although the Defendant offered evidence demonstrating a contradiction between a utility record for the Montclair address and a statement in the affidavit about Defendant's status as a utility account holder for that address, Defendant did not present evidence demonstrating that Nicholson deliberately or recklessly included this false information in the affidavit.[13] Courts do not require that every fact recited in an affidavit be correct. *Buchanan*, 574 F.3d at 563 (*citing Franks*, 438 U.S. at 165).[14] Whether a statement was made with reckless disregard for the truth turns on "whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010). A showing of negligence

---

[13] Recklessness may be *inferred* where the material would be "'clearly critical' to the finding of probable cause." *See e.g. United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (noting recklessness can be inferred when omitted material would have been critical to probable cause finding). Defendant has not provided support for the inference that the false information was recklessly included or demonstrated the false statement here was critical to the finding of probable cause.

[14] "[P]robable cause may be founded . . . upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Buchanan*, 574 F.3d at 563 (*citing Franks*, 438 U.S. at 165). An affidavit must "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id*.

or innocent mistake is not enough to establish a *Franks* violation. *Franks*, 438 U.S. at 171.

During the suppression hearing, the Court gave Defendant the benefit of a *Franks* hearing, allowing counsel to cross examine Nicholson about his statement regarding the utility records. The undisputed evidence shows that Nicholson discovered Norey was a responsible party for the utility account at the College address, and that his wife, Natasha, was associated with the utility accounts at both the College and Montclair properties. Nicholson further testified he knew or believed that Roy and Natasha Norey were married and did not realize he had mistakenly noted the account information when drafting the affidavit. The Court finds Nicholson testified credibly regarding his confusion and resulting unintentional mistake and cannot conclude that he entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported. Nicholson's knowledge that Roy and Natasha were married, and that Natasha was associated with both utility accounts suggests it was not unreasonable for him to believe Roy was noted as an account holder on the utility records for the Montclair address. Because Defendant has not demonstrated the statement was deliberately or recklessly included, and, further, because the Court has already found that the affidavit did not properly support probable cause in the first place, the Court need not analyze the second prong of the *Franks* test.

### III.  Recommendation

For the foregoing reasons, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress Evidence (doc. 23) be **DENIED**.

/s/ *David P. Rush*
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE:  November 5, 2019